Good morning, your honors. May it please the court. David Anikyariko for the appellant, Mr. Pasha. I'd like to reserve four minutes, please. Mr. Pasha is entitled to a new trial with 12 impartial jurors or to a new sentencing hearing. I'm going to focus on four of the claims, but if the court has any questions about the others, I'll be glad to answer them. Those are the biased juror, the identity theft counts, and the sentencing enhancements for charitable organization and intended loss. Turning first to the biased juror, which is argument one of appellant's opening brief, there's no reasonable dispute that juror Fox's pretrial statements were disqualifying. His traumatic history of discrimination and violence against him was triggered, he was angry, and he dismissed the defense as a scapegoat without yet hearing any evidence. He said he couldn't be fair. The only question is whether his purported 180-degree turnaround was reliable enough to protect Pasha's constitutional right. And here it plainly wasn't. The juror saying the magic words isn't enough when the circumstances are unreliable. By the same token, when a judge makes findings under unreliable circumstances, those findings are unreliable. Mr. Anikakariko, I guess I'm trying to pinpoint juror bias claim here, it'd be structural error. When did it occur? I think one of the puzzling things about the way this unfolded is that the district court, that came up after Vardir, then I think before the juror was seated, is that right? And then a weekend passed, and then the juror was seated as an alternate without any further follow-up, is that right? And then later on, after the pause in the trial on the Tuesday, on the Wednesday, the juror comes off of the alternate and enters in. And of course, I think you'd agree with me, whether the juror is an alternate or not doesn't change the analysis, is that right? So most of our cases, as far as I can tell, nearly all of the cases let us know if it's different, involve the curative colloquy and the assurance, whatever the status of that assurance is, comes at the same time. It's during Vardir, the district court will pull the juror aside, conduct the follow-up, and if there's an assurance that does the trick, it happens then, and if there's not, it doesn't happen then. What are we to do, I mean, where is your assertion of kind of where the error occurred here? Was it the fact that the juror was seated after this initial problematic colloquy at all? What does the curative statement afterwards, a few days later, mean? How should we parse this for purposes of our bias analysis? Your Honor, a structural error occurred at the time that the juror was allowed on to the jury as an alternate. As your Honor noted, all of the case law involves curative statements before the juror is let on to the jury, and this is a structural error. It's concerned about this, the circumstances that are created here show exactly why the juror shouldn't have been admitted in the first place, because after that, the circumstances under which he gave his purported assurance become unreliable. Okay, now what do we do with the fact that some of our cases, I believe, and it happens, sometimes actual bias only manifests much later, right, even in deliberations, and yet, again, tell me if you're wrong, but I think there are at least some circumstances in which a juror can provide assurance after having been seated on the jury, and so why wouldn't that reopen the second colloquy to being curative, not withstanding the fact that the juror was seated? Even if it did, your Honor, the circumstances here show clear error at the time that this juror was moved from an alternate to a seated juror. Why is that? Because, I mean, the juror says, no, I don't. I have no hesitancy about my ability to set aside my prior views and be fair and impartial, so what, yeah, what, I mean, what's the problem? For several reasons, Your Honor. The first is that the first thing that the judge said was, Mr. Fox, you're now on the jury. So he had just been ordered by a federal judge to be on the jury, and the human impulse under those circumstances is to not want to refuse this order from the federal judge. Why does that, Matt? I mean, we have, I think, in at least one of our cases, we suggest and kind of dicta that human element, but have we ever held that that happens? I mean, of course, the district court proceedings are suffused with power relationships between the judge and the jury and the parties, but how does that move the needle kind of rule-wise in our analysis? In the Gonzalez case, this court held that a juror's assurance is given significant weight, but it's not dispositive, and that's because jurors are human. They're frequently reluctant to admit their bias, so you have to look at the context, and any doubts must be resolved against seating the juror. So is there something in particular about the context here other than the judge saying, you know, you're on the jury, that makes the juror's statement not trustworthy or not, or something that wasn't curative? Yes, Your Honor. In addition to that, we also have the defendant then confronted and cross-examined Juror Fox about his bias and told Fox directly that he didn't want him on the jury. Now, the human impulse in that circumstance, that uncomfortable circumstance, is to try to smooth that over and say, no, there's no problem here, it's going to be fine. We also have that the juror had now been influenced by the prosecution's evidence so far. Jurors, as the case law recognizes, jurors are supposed to be kept away. That's the purpose of having a quardere before any evidence is shown to the jury. And furthermore, the juror had already invested his time in this case, and he was now incentivized to just stay and see it through. This court's Kacedzian case at page 1030 talks about the investment the jurors feel in their role and their commitment to seeing the process through. So that's yet another circumstance making it reliable. So in that case, I think we said, and this would be a question I have for your friend as well, that although it didn't involve similar circumstances and whether you can always come back to cure the bias, which I think is the way that this would have to work, it says, although that wasn't the case in Kacedzian, they said that that plan wouldn't work for these reasons, but it wasn't really a direct holding that such plans can't work. Is judicial recognition of the difficulty of these circumstances and the unreliability of the circumstance? Well, I guess, you know, I think in terms of our cases in trying to be respectful of the jury and the jury's critical role here, why couldn't the district court have taken, again, I think in clear error review, a statement that I'm fine now and, you know, repeated assurances, enough. This was a, this juror was loquaciously candid, maybe more so we've seen in some other cases. But, you know, in the district court's shoes, we've got an assurance, which is what we've said we've needed. So why doesn't that dissipate all the other noise about the concerns? And how would we, if we decide something different, how do we put that in a rule in the context of an assurance usually being enough so that a district court can move on with the trial? Two further points there, Your Honor. First of all, we have to look at what the juror said, because right there, interspersed with his purported assurances, was that he continued to show the true impact that it had had on him when he said, in the midst of those assurances, hearing that was so abrasive. It brought up a lot of bad issues that had happened in the past. Trauma came up that I wasn't expecting to deal with. He spoke again about having bottles thrown at his head. The entire time you were talking, that's all it was, discrimination against the Islamic faith. So it shows that this is still very much on his mind. And secondly, in none of the government-cited cases did the juror make comments so angry and dismissive towards the defense as Juror Fox did. He said there was no way he could let it go because of his neurodivergence and because of his history of discrimination and violence, and then make an alleged 180 turnaround. None of the cases are like that. So the ardently expressed bias in this case makes it different than the other cases where courts have allowed subsequent assurances to ameliorate the situation. But counsel, when you began your argument, you said that he showed actual bias during the voir dire. Isn't it fair or more accurate to say he showed some possible implied bias than the statements he made that go to actual bias occurred after he was seated? And then we have all the colloquy where he sort of disavows that. But I don't see from the initial voir dire anything that jumps out that much. So can you focus on that portion of the record to point to us what you believe was actual bias from his comments about law enforcement generally, blue backs blue, that kind of thing? What was it that you believe was actual bias before he was seated? After those comments that Your Honor is talking about, there were all of everything he said about having bottles thrown at his head, about having been discriminated against as a gay and transgendered person. And he was so angry that was after the weekend. I have to disagree, Your Honor. He talked about things before and after the weekend before he was seated. And after he talked about having bottles thrown at his head, he said he was festering in his head and he wouldn't be able to let it go. This all happened before the weekend. And the judge said, well, you're coming back on Monday. All those comments took place before. Are you making an implied bias claim? No, Your Honor. This is actual bias. It's the existence of circumstances that lead to an inference that a person couldn't act with entire impartiality. At a minimum, there was a doubt which had to be resolved against the juror. If we agree with you on the bias claim, do we need to reach any of the other issues, sufficiency instruction and anything else? Is there anything else there that we ought to be providing the district court to move forward with? It would be good to advise the district court about the sentencing issues if those come up. But no, Your Honor, basically structural error means a new trial in this case. And there's no. So sometimes if if there are errors assigned to the indictment or other earlier stages, we might have to reach that. But none of the issues here you're containing are issues that we would have to reach, given where the structural error you assign occurred. There is one that comes to mind, which is the jury instructions issues on the witness tampering. That would be an error that the judge wouldn't want to repeat. Was that preserved? I mean, with respect to the jury instruction, I guess. I believe I believe not, Your Honor. OK, so that would be reviewed for plain error. That's right. OK. I'll next turn to the identity theft argument to the opening brief. Using Mansour's and Wilson's names on some of the loan applications is what these identity theft convictions were based on. In Dubin, the Supreme Court said that too many fraud crimes are also charged as identity theft when the use of a person's identity was only incidental. The defendant is already being punished for the fraud. We don't also slap him with a mandatory two consecutive years in prison for aggravated identity theft unless identity use was at the crux of the fraud. And in this court's very recent Motley case, the court reiterated that identity use has to be critical to the success of the fraud. Why isn't this closer to Parvez? Because in Parvez, the forged doctor's note was critical to getting the passport granted in absentia. Could the defendant here have been eligible for the loans if he used his name? Yes, he could, Your Honor. And that's that's a red herring that I want to clear up. OK, please do. He did not need their names on the loans because the rule was one business, one loan, not one person, one loan. But if I guess the if if again, we're now we're talking about sufficiency. And so if the government's theory here is that he did that to conceal the alleged shell game that he was playing to get these other loans, then it was one. And if his name appeared on three different corporations, that would have arose suspicions. And again, the question is just whether the evidence is sufficient to show that that was the reason he used it, isn't it? Your Honor, in Motley, the situation was the same that we have here and Motley reversed, which was using someone else's names on applications for a government program. He didn't need their he didn't need their names. And that's the question is whether it's critical to the success, not whether it facilitated it, but whether it's critical to the success. And here there was no evidence that he couldn't obtain these loans by using his own name. The government mentions that he had a criminal record, but the defendant's criminal record wasn't a problem when he received already a PPP loan. So that's that's another red herring. The question is whether his use of the names was critical. And in this case, it wasn't. There was no evidence that he couldn't have done it on his own. I'll speak briefly about the intended loss sentencing issue. The common sense meaning of loss is having lost something. And under Kaiser, the common sense, plain text meaning of guidelines is what the court follows. It's the very first rule of statutory construction. There's no rational argument that loss means loss that never occurred. Haven't we held losses ambiguous? The only published case in which this court has held that, and there is a split on this issue, but this this court has not issued a holding on the intended loss question. In the Yoffa case, which I believe Your Honor is referring to, they said that loss was ambiguous enough for a particular context, which was that if you can't tell how much was actually lost, you can use gain, the defendant's gain, as an alternative measure of the victim's loss. But Yoffa specifically said that it wasn't deciding the issue of intended loss. So this is very much an open question in this circuit's published authority. The government mentions and some of the cases that have come out the other way on the split mention, well, how do we account for relative culpability between defendants if we don't include intended loss? And the answer is that the guidelines already take care of that. They don't ask the court to torture the meaning of the plain text of the guideline. They allow a court to vary from the guidelines range if relative culpability isn't taken into account, if there are circumstances that make this particular case worse. So we don't need to, as I said, torture the plain meaning of the word loss. Another point that the case law and the government has tried to make is that the relevant conduct rule of Section 1B1.3 also includes harm that was the object of the acts. But this is only a general rule. It doesn't supplant the specific guidelines. The examples wouldn't make sense if it did. For example, the guideline that punishes a large capacity magazine on a firearm wouldn't make any sense if you could say that, well, the defendant intended to possess one, but he didn't actually possess it. He's still guilty of possession of a large capacity magazine. Or the example of enhancement for 10 or more victims. If there were only eight victims, but the person intended two more victims, that enhancement would not apply because of the relevant conduct rule. There were only eight. There weren't 10. Regarding the charitable organization, I see that I'm nearly out of time. So I'll just say that it was the government's burden to prove that all 501C3 organizations are charities, or to show that All Hands on Deck was registered as a charity, as a charitable organization under 501C3, as compared, for example, to an educational organization. And there's lots of evidence in the materials that the government cites about the educational mission of All Hands on Deck. So the government had the burden to prove it, and it entirely failed that at the sentencing. Okay. Thank you. I'll give you three minutes for rebuttal. Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the Court. Ross Mazur on behalf of the United States. This Court should affirm the judgment in full, including the eight counts challenged on appeal out of 44, the finding of no actual bias, and the decisions on the guidelines and on restitution. So let me turn to the four issues that opposing counsel addressed. Starting with the juror, the record just doesn't show actual bias. The juror fully engaged, actively participated in voir dire, flagged his emotional response immediately for the judge when it came up, and after giving some time to reflect on it, came back to court, explained his earlier comments, and repeatedly committed to be fair and impartial in deciding the case. It seems to me that the juror's later comments were quite equivocal in kind of all our decision in Kitchezzie, and he says that he had a scratch in the back of his head, that he had to remember over the weekend what he'd had to do in the past to overcome the issues that he's dealing with. He states again that all he was hearing from the defendant was discrimination and that things get stuck in his head for a while. Why didn't that all present a reason to still really be concerned that the juror was holding on to bias that he had expressed earlier? Well, some of those comments came when the judge invited the defendant, given the opportunity to ask more specific questions of the juror, specifically about, well, what did I say in the first place to trigger you, and how exactly did you get over it? So only in that context did the juror try to explain what he was thinking in the first place and what he was thinking now. It's not realistic to think that the juror on Friday is willing to express in a very candid and forthright way his reservations about his own potential bias, and then early the next week, as defense counsel suggests, that he's simply going to do a 180 and kind of bow to the pressure of staying on the jury. I'll also note that at the beginning of the second colloquy, the judge admonished the juror for the equivalent of three transcript paragraphs about the critical importance of being completely candid about his ability to be impartial. And unlike, I think, every case that I'm familiar with where this Court has reversed an actual bias claim, the juror unequivocally committed in response to repeated questioning that he could fairly impartially evaluate the evidence. I think that the purpose behind rehabilitation is that in any actual bias claim, there's going to be something the juror says that might indicate some concern. But judges have discretion to ask additional questions. And rehabilitation just recognizes that jurors are going to come in with their own beliefs, their own experiences. And the question isn't whether they're acting on a blank slate. The question is whether they can put those aside and just decide the case based on the evidence. And I think the record unambiguously here shows that this juror could do that. Why isn't at least one spot to look for the relevant error here? It is just unlike our other cases that the work of rehabilitation and any curative comments that came didn't happen during Varder. The juror was seated, and I guess I just don't find it ambiguous. I mean, set aside the deep-seated concern of this use of what the juror calls this kind of discrimination, scapegoating, and the fact that he said they're turning a small thing into a big thing, law enforcement. So there's a thing. So there is a thing. A juror says that there's a crime here. And rather than get on top of that and try to remedy and see whether you could get a curative statement so the trial can move forward the following week, sent away, the juror is seated. I don't see how that alone is an error. And if it is error, I guess, can you help me try to understand how a colloquy after the presentation of evidence has begun can cure that? Well, when the juror said there is a thing, he was parroting the defendant's comments at the end of Varder, where the defendant said law enforcement takes one small thing I did wrong and stretches it to make me look like Hitler's cousin. So the juror was picking up on a Varder that, because Mr. Kollar was pro se, really went far beyond the bounds of just testing impartiality. And that's what he was responding to. And to a certain extent, I think, you know, if the defendant wanted to try to present some of his case in Varder, he's a little bit stuck with the possibility that the juror is going to react to that. No, I certainly don't envy the district court's position of having the defendant doing Varder, and as you said, quite extensive and unusually substantive Varder, and then following confronting the juror with respect to the bias. But I guess why shouldn't that not caution for more circumspection rather than less and a quicker response rather than putting it off until the next Wednesday? So on the question about timing, you know, the juror really participated fully and actively in Varder and gave no cause for concern. He indicated that he was receptive to any defense based on discrimination and that he was, if anything, a little bit hostile to law enforcement. I'm talking about ideas like blue, blacks, blue. He was receptive to the defendant's themes. And then, you know, but after he was sworn, at the end of a very long Friday after he was sworn, he came up to the judge and said, you know, I didn't think this would be an issue. But at the very end of Varder, the defendant said some things that triggered me. And, you know, he was probably referring to when Kollar talked about, you know, events going back a long way. J. Edgar Hoover, the FBI, having hand in killing Malcolm X, quote, everything that's going on with Donald Trump. You know, police officers being charged with murder around the country and so forth. And, you know, the juror said, you know, I reacted to this. Now, I don't think it's, you know, in terms of the timing question, it was at the end of a long Friday. The judge said we explored this during Varder and the juror agreed, you know, I didn't have a problem with this. And so I think it was reasonable or at least permissible, given the judge's, you know, significant discretion in this area to ask the juror to come back the following week and then to conduct an additional colloquy. Have we I guess I'm trying to figure out where this fits with respect to our cases. Again, let me know if I'm missing one. But we're usually looking at the bias issue arising and then the cure occurring in the same colloquy. Have we had a case? Can you point to a case? And what should we be looking at for this idea that after if it's actual bias, after that bias is expressed, that you can seat the juror, go to a day of evidence and then come back to it later on in the trial, that that would work? I mean, have you seen I mean, I'm not suggestive. I'm not sure that we've seen this case either way. But what's the best fit for for a circumstance like that where it's not nipped in the bud in the first colloquy? Well, the Gonzales case in 2018, there are two Gonzales cases involved a bias claim that came up mid trial where a juror had a very strong reaction to some of the evidence that was hostile to the defense. They after indicated she couldn't be impartial at all. But after further questioning said that she could in this court affirm. But just to clarify that the timing in this case, the you know, after void, you concluded the jurors were all seated, including the juror at issue in this case. And not that it was as of Friday or first thing Monday. Seated on Friday. On Friday. So this this the first colloquy happened after he was seated. Yes. So the colloquy that, you know, give rise to this concern happened after the jurors were already seated. So there was no possibility of doing it before then. It was, you know, at the end of a long day of ordeer that, you know, the judge permissibly exercised his discretion to ask the juror to return the next week. You know, this was not mid trial. The jury heard opening statements and two short witnesses. And, you know, that was it out of a three three week trial. And, you know, there was a further colloquy. I also think that, you know, even though, you know, I believe like the unequivocal assurance in this case. You know, I really don't think this is a close case, but the court doesn't actually have to reach the merits if it wants to, if it can hold that the claim was actually waived. Because after the second we get to that council, can you give us your view on Eastman Kodak? Whether it's this is analogous to that. I'm trying to sort of mirror the timing. And I'd like your views on on that. And now it gives to Eastman Kodak, the Ninth Circuit case in Eastman Kodak. Didn't that come up after the juror was seated? That sounds right to me, but I just don't recall the timeline in that case. Yeah, that may be another example. All right. Go ahead. And if, you know, the court doesn't have to reach the merits, because I think the issue was waived. You know, after the second colloquy, the juror was so convincing that even Kolar could only say that, well, you know, I acknowledge that he, you know, he just said he was impartial. My objection is that if something else comes up, something else comes up that I say and it re-triggers his emotions, I don't think he can put that aside. So that the objection was really future oriented about the possibility that something could arise during the trial that could, you know, something else that could re-trigger the juror's emotions. And when near the close of trial, Kolar was offered the possibility. I guess that's not all he said. And I'm going to continue the objection. I don't believe that he can put that aside currently. Then he says, if something else comes up, whatever his emotions, I don't think he can put it to the side. But I get clear error that we weren't there, that the district court was. I mean, I don't take the government to be suggesting, at least on the defendant's terms of the bias, that if he were biased towards the scapegoating or the use of that theme, that that wouldn't be sufficiently pertinent to the trial. I mean, the defendant throughout delivered on what he promised in his opening like Vardir, in his opening, in his questions. I mean, this theme of being oppressed by law enforcement because of his religious and racial identity pervaded the trial. And isn't that exactly what the juror said? He had a problem with the defendant scapegoating? I don't think so, Your Honor. I think the rehabilitation should end this issue. But even if you take the first colloquy on its own, I don't think it establishes actual bias. The juror doesn't give an entirely logical argument about what triggered him and how that biased him against the defendant. But you see two themes really in both colloquies. One is that something about the discussion of discrimination triggered a lot of his own memories of discrimination and violence. They were different from the type Kohler was describing. But he said, I didn't know that was going to be the actual defendant's stance, that he took that to be the defendant's defense. So I think this is the second theme. OK. Most of it was just about his own reactions. And when he came back, he said, look, I thought about it. I remembered these were my own issues. I remembered I had gotten over that. That's what I had to do. But the second theme, I think, was that the juror perceived that the entire defense, all of the defense, and this is what he keeps emphasizing, would be discrimination. And it wasn't. And after all, if a juror is hostile to the idea that the defense is going to talk, that the only theme of the defense will be law enforcement discrimination writ large, I don't think that shows actual bias. But the defense wasn't like that. I mean, Kohler, among other things, suggested that the PPP applications were complicated. So his misstatements may have been made in good faith. He blamed other people for some of the criminal conduct. One young woman, Kerticia Holden, who was really a victim of Kohler's, but who participated in some of the illegal activity. Does it matter, though? I guess, I mean, where have we said that if he's really biased against only a little bit of the defendant's case, that that's enough? I mean, don't we hold jurors to a higher standard? We do, but he wasn't biased against a little bit of the defendant's case. In fact, you know, during his voir dire responses, I mean, he was giving a civics lesson about, you know, historical discrimination against black organizations and black churches by law enforcement. What he was hostile to was the idea that the entire defense, all of the defense, could come down to discrimination, that there was nothing more to it. And, you know, that wasn't the case. Which statement do you have in mind for his understanding that his bias is predicated on it being the only defense as opposed to the theme that he's sounding? You know, I'm sorry, Your Honor. I don't have the specific statements in front of me, but I think in both the first and second colloquy, I mean, in the second colloquy, he's even trying to remember what Kolar had said. You know, because most of it for him is about his own personal reactions. In trying to remember, he says, I just thought it was, you know, all that came out was discrimination and there was nothing but that. You know, and he was absolutely receptive to the idea that there is a lot of discrimination against the black community. You know, that was something he brought up himself and flagged it as a potential pro-defense bias in his voir dire. So he wasn't even taking the remarks in the initial colloquy on their own. They didn't demonstrate actual bias. Mr. Mazur, I guess the same question I asked your friend, if there is structural error here, do we reach any of the other issues? Is the government asking us to reach any of the other issues? No, I don't. I don't see a need to reach the other issues if there's structural error here. OK, I didn't see. Maybe I missed it. The government provided a 28-J in response to the Motley case. What's the government's position on the aggravated identity theft in that case? So the Motley case was, I think, published a week or two ago and it dealt with a fraud involving relatives and was found. It distinguished Parvez in some of the other cases under Dubin. Yeah. I mean, in this case, the defendant impersonated and purported to take actions on behalf of Mansour Bey and Byron Wilson by forging their signatures and on the PPP applications, which is the standard articulated in Motley. I mean, this case is really like Gagarin, which is a case, a pre-Dubin case approved of by Motley where the defendant forged her cousin's signature on a life insurance application in the cousin's name to run a fraudulent scheme for getting advances. What's, I guess, the response to the kind of the sufficiency piece? The government didn't show enough to show that the other people's names was essential to him getting the fraud because he could have gotten the loans with his own name. Well, in Gagarin, it was enough that the use of the signature obscured the defendant's own role in the fraudulent scheme and was thus central. But, you know, even though I think that's enough here, there was a lot more than that. I don't know if I can conclusively say that defendant's applications would have been denied, but in all likelihood, they would have been denied if he had put his own name. The SBA representative testified that the identity of the owner or the CEO was essential to processing a PPP application. Lying about it was disqualifying. And I can point to at least three reasons why the identity of the CEO or the signatory mattered. The first is to show who actually gets the money. Kolar put down the names of Montserrat Bay and Byron Wilson as the CEOs, but the FBI forensic accountant testified that the accounts linked to those companies went back to Kolar. So if those loans had been funded that were purportedly applied for by Montserrat Bay and Wilson, Kolar would have gotten that money. The second reason is to see if the owner was affiliated with any other companies. The SBA representative testified that this was critical. If Kolar had used his own name, the SBA would have seen the connection with AHAD, which had already received a loan, and at a minimum would have raised a lot of red flags. And lastly, you know, the identity mattered to see if the applicant was otherwise disqualified. And here, Kolar would have been. One of the questions on the form asked about a criminal conviction in the past five years. Kolar had one, and he lied about it. Excuse me. Had he put his own name, that would have been disqualifying for at least four of the accounts, counts 29 through 32, because they were within the five-year period. The fifth one wasn't, count 33, but that application was submitted after AHAD was under investigation and the funded loan had been seized, and so it would have been flagged for that reason. Opposing counsel says, you know, the criminal conviction can't matter if the AHAD loan was funded and that loan was submitted in Kolar's name. The reason that that loan was funded was because Kolar lied on the application. That's at 12 ER 1928. So the identity of the CEOs was absolutely critical. This is not a case where the defendant just inflated the salaries of people who worked for that corporation. He took the names of two people that had nothing to do with oversight or family investment group and purported to make them the reputed CEOs of these companies. If the court would like, I can talk about either intended loss or charitable organization. That's all right. Thank you very much. If you want to take 30 seconds and just close up, you can. The government would ask you to affirm. OK, thank you very much. Thank you very much for the rebuttal time, your honors. Regarding the biased juror, structural error occurred at the moment that a juror with admitted bias was seated on the jury. Well, but the juror was, as we understand it, the juror had already been seated. Do you disagree with the timeline? So so Vardar had had it concluded they were seated in the juror. The first call we happened after the seated. Or do you disagree with that timeline? That's not my recollection of the timeline, your honor, that he was. Well, in any case, the moment that he was allowed onto the jury or kept on a jury right out, the moment that he admitted bias and was kept on the jury. That was structural error. And and the judge, we know that that the judge was uncertain about him because the judge said, well, we all know we're going to have to voir dire him again. At this point, he should not have been on the jury. And there are good reasons for that. The jurors are supposed to be kept away from the evidence before they are seated on the jury. And sometimes things do come up during trial for the first time. You know, there are cases where a juror's bias isn't exposed until something happens during the trial. But that's the time when the juror is examined and if can make adequate assurances at that time is allowed to remain on the jury. This juror with bias was allowed to be on the jury for a couple of days before. He was allowed moved from an alternate to a seated juror and structural error occurred during that time. Was wasn't a juror in Eastman Kodak's allowed to to be seated for two days before that second questioning, though? I am not familiar with the facts. No one's familiar with this case. All right. I apologize. My apologies. Furthermore. Even during the purported assurances right there interspersed with his comments that he could be fair. He was talking about how it was so abrasive to him to hear that, how it brought up a lot of bad issues in the past. Trauma came up that I wasn't expecting to deal with. He talked again about bottles being thrown at his head because of who he was. The entire time you were talking, that's all it was discrimination against the Islamic faith. It shows that this is still very much on his mind. And and finally, in no case that the government sites that I've been able to locate, does a juror with this level of bias? Then show a couple of days later that it has evaporated. He's made a 180 turnaround and he's totally fine now. And the appellate court is satisfied with that assurance. Turning to the identity theft. It's critical to recognize that Mr. Pasha did not forge signatures on these loan applications. And he had Wilson's and Mansour's authorizations. That was something that this court relied on in the Motley case. Mansour testified that he was the CEO of OS on paper. He said he authorized posture to sign the loan applications on his behalf. And the defendant had power of attorney, just like in Motley. OK, I think you're you're out of time. Do either of you have any questions about this? OK, I think we have your position on that. Thank you. Thank you very much. We think both counsel for their very helpful arguments in this case. This case is submitted and the court stands in recess for the day. Thank you.
judges: THOMAS, JOHNSTONE, Vera